UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ALVIN MOSBY, LILLIE JEAN CLYBURN,    :
SAM HAM, and CLYDE RICHARDS,         :
    Plaintiffs,                      :
                                     :
v.                                   :   Civil No. 3:04cv917 (JBA)
                                     :
AFSCME INTERNATIONAL UNION,          :
COUNCIL 4 AFSCME AFL-CIO,            :
PATRICIA GLYNN, and SAL LUCIANO,     :
    Defendants.                      :

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. # 40]

Plaintiffs Alvin Mosby ("Mosby"), Lillie Jean Clyburn ("Clyburn"), Sam Ham ("Ham"), and Clyde Richards ("Richards") are African American former officers of AFSCME Local 1042. They have filed this lawsuit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1985, alleging that AFSCME International and its Connecticut regional body, Council Four, as well as New England Field Service Director Patricia Glynn ("Glynn") and Council Four Executive Director Sal Luciano ("Luciano"), discriminated against them on the basis of race by placing Local 1042 under administratorship and expelling the individual plaintiffs from AFSCME membership. See Second Am. Compl., 4/25/05 [doc. # 38]. Defendants have moved for summary judgment, see Motion for Summary Judgment [doc. # 40], and for the reasons that follow, defendants' motion is granted.

I.    FACTUAL BACKGROUND

The membership of Local 1042, which represents custodians

1

and maintenance workers for the Board of Education in Norwalk, Connecticut, is largely African American.  Def. L.R. 56(a)1 Stmt., Ex. 8 (Deposition of Alvin Mosby) at 33; Pl. L.R. 56(a)2 Stmt., Ex. 52 (Contract between Norwalk Bd. of Educ. and Local 1042 of Council #4 Custodians and Maintenance).  Plaintiff Mosby was elected president of Local 1042 in 2000, when he succeeded his father, John Mosby, who had been president since 1973.  Alvin Mosby Dep. at 8; Pl. L.R. 56(a)1 Stmt., Ex. 2 (Tr. of AFSCME Judicial Panel Hrg. 7/31/03), Testimony of John Mosby at 49.  Plaintiff Clyburn was elected Secretary/Treasurer of Local 1042 in 2000.  Second Am. Compl. ¶ 14.  Plaintiff Richards was elected Vice President also in 2000, and Plaintiff Ham was a member of the Executive Board.  Id. ¶¶ 15, 16.

The union organization is as follows.  The local bargaining unit, in this case Local 1042, collects dues and performs small tasks such as sending cards and flowers to members who are ill. See Def. L.R. 56(a)1 Stmt. Ex. 3 (Deposition of Patricia Glynn) at 42-43.  Council 4, the regional representative body, is the recognized collective bargaining agent and thus is responsible for negotiating contracts, lobbying for legislation in its members' interests, and hiring lawyers to represent Local members in grievance hearings.  Above the Council in the hierarchy is AFSCME International, which has designated various statewide and regional representatives for purposes of liaison, training and

other functions.  <u>See</u> Luciano Dep. at 4; Tr. of Judicial Panel
Hrg. at 12 (Testimony of Kevin M. Murphy).  Under the AFSCME
International Constitution, Locals are responsible for assessing
minimum dues, which are apportioned roughly 60% to the regional
Council, 30% to AFSCME International, and 10% to the Local.  Def.
L.R. 56(a)1 Stmt., Ex. 2 (AFSCME Int'l Const.), Art. IX §§ 5, 6.
The dues are assessed to the Local on the basis of the number of
members and are referred to as a "per capita tax."  <u>Id.</u> § 10.
The AFSCME International Constitution provides:

> Failure of a local union to remit its International per
> capita tax for any month by the 15th day of the
> following month shall result in the local being
> declared delinquent.  Failure of a local union to remit
> its International per capita tax for any month within
> sixty days after such local is declared delinquent
> shall result in the suspension of the local, and the
> International Secretary-Treasurer shall notify the
> local of its suspension. ...

<u>Id.</u>

For many years, Mosby and Local 1042 were unhappy with the
representation provided by Council Four, and particularly with
several attorneys who were hired in succession to represent their
members at grievance hearings.  Mosby Dep. at 18-19.  As a
result, the Local had hired outside attorneys for several
matters, including grievances brought by Alvin Mosby.  <u>Id.</u> at 24-
28.  In March 1998, the Connecticut State Board of Labor
Relations ordered John Mosby and the Local to pay approximately
$9,000 in attorney fees to two members of the Local who had filed
and prevailed on grievances against John Mosby and Local 1042 for

intimidation and unfair practices.  <u>See</u> Def. L.R. 56(a)1 Stmt.,
Ex. 7 (decision of Labor Board 3/26/98).  Alvin Mosby believed
that Council Four had an obligation to assist the Local with this
expense,[1] and believed that the Council should waive the Local's
per capita taxes while it paid off the $9,000 debt.  Mosby Dep.
at 19-22; Def. L.R. 56(a)1 Stmt. Ex. 6 (undated letter from Alvin
Mosby to Kevin Murphy).

On July 17, 2002, Kevin M. Murphy, AFSCME's Coordinator of
Collective Bargaining and Organizing, wrote to Alvin Mosby
telling him that the local was eight months in arrears in paying
per capita taxes, which constituted a violation of the AFSCME
International Constitution, and stating that the "Local has been
placed in a very dire position...."  Def. L.R. 56(a)1 Stmt. Ex. 5
(letter from Murphy to Mosby) at 3.  Mosby responded in writing
that the Local "was under a financial hardship" due to the
judgment against it, and reiterating his unhappiness with Council
Four's service.  <u>Id.</u> Ex. 6 at 1.  He further stated: "In your
letter Mr. Murphy you threatened Local 1042 that you were going
to take the Per Capit[a] dues directly from the payroll.  I would
like to warn you Mr. Murphy that if this action is taken it will
leave Local 1042 no other choice but to take this matter to the
Executive Board and membership for de-certification vote."  <u>Id.</u>

---

[1]Council Four was not a party to this Labor Board matter.
Def. L.R. 56(a)1 Stmt., Ex. 7 (decision of Labor Board 3/26/98).

at 2.

On July 25, 2002, defendant Luciano replied to Mosby's letter and wrote that "[r]egardless of these differences of opinion" concerning Council Four's legal representation, "Local 1042 is under a continuing obligation to comply with the Constitution and remit dues in a timely manner." Id. Ex. 9.  On July 29, 2002, Mosby wrote back to Luciano stating that the Local would "hold the representatives accountable.  Just remember what happened to the local in Stamford." Id. Ex. 10 at 2.

Mosby testified that he was referring to Stamford Local 1083, with whose president, Joe Kapor, and vice president, Mike MacIntosh, he had met in 2001.  Mosby Dep. at 28-29, 31, 45. Local 1083 had de-certified AFSCME, essentially seceding from the organization, because they also were unhappy with the representation of Council Four's attorneys.  Id. at 28. According to Mosby, the officers of Stamford Local 1083 "were mostly Caucasian." Id. at 33.

On August 2, 2002, Luciano wrote back to Mosby stating that "[i]t is essential that you remit per capita payments immediately to bring Local 1042 into compliance with the Constitution."  Def. L.R. 56(a)1 Stmt. Ex. 11 (letter from Luciano to Mosby).  The letter did not mention Mosby's threat to de-certify.

Mosby states that he and plaintiffs Ham and Richards met with Murphy in September 2002, "and it was agreed that Local 1042

could make partial payments of per capita taxes beginning September 2002, following completion of the payment on the judgment." Def. L.R. 56(a)1 Stmt. Ex. 20 (Mosby Aff.) ¶¶ 4-5. On October 12, 2002, plaintiffs tendered a check for $872 to Council 4 in partial payment of their arrearage, which by that time exceeded $16,000. Pl. L.R. 56(a)2 Stmt. Ex. 15 (accounting report of Marguerite Badolato 11/7/02); Def. L.R. 56(a)1 Stmt. Ex. 19 (Judicial Panel Decision Re: Administratorship 12/4/02), Ex. 1.

The check never was cashed, however, and on October 24, 2002, AFSCME International President Gerald McEntee wrote to plaintiffs Mosby, Grimes and Clyburn that he was "placing Local 1042 under administratorship, pending notice and hearing, effective immediately," because "dissolution or secession of the Local is threatened, dissipation or loss of the funds or assets of the Local is threatened and the Local is acting in violation of the International Constitution." Def. L.R. 56(a)1 Stmt. Ex. 12. McEntee appointed defendant Glynn, AFSCME International's New England representative, as administrator. Id. The following day, Luciano wrote a letter to the membership of Local 1042 explaining that their Local was being placed in administratorship for nonpayment of per capita dues to Council Four. Id. Ex. 13. On October 30, 2002, Glynn wrote to Clyburn "requesting that you turn over to me all books, records, funds and other property of

the Local that are in your possession, custody or control." Id.

Ex. 14.  Clyburn testified that she, Alvin Mosby and John Mosby

then met with Glynn and an auditor, Owen Martin, at a hotel in

Hartford, where they turned over the books and records of the

Local.  Id. Ex. 15 (Clyburn Dep.) at 20.  Mosby testified that

they relinquished the records voluntarily at Glynn's request.

Mosby Dep. at 118.

A hearing was scheduled before the AFSCME International

Judicial Panel for November 7, 2002.  See Mosby Dep. at 86

(testifying he received notice of hearing).  Mosby requested a

continuance, Def. L.R. 56(a)1 Stmt. Ex. 17 (letter from Mosby to

John Seferian, Judicial Panel Chair, 11/5/02), which was denied

on the grounds that the procedures Mosby demanded under Article X

of the International Constitution were inapplicable to the

hearing to be held pursuant to Article IX, Section 36 of the

Constitution.[2]  Id. Ex. 18 (letter from Seferian to Mosby

---

[2]This section of the International Constitution states: "If
the International President shall find (1) that a subordinate
body has seceded or purported to secede, or (2) that dissolution
or secession of a subordinate body is threatened, or (3) that
dissipation or loss of the funds or assets of a subordinate body
is threatened, or (4) that the subordinate body has deliberately
filed false per capita tax or other financial or audit reports
with the International Union, or (5) that a subordinate body is
acting in violation of this Constitution or of any lawful order
of the Convention, the International Executive Board, or the
International President, so that in the opinion of the
International President an emergency situation exists, the
International President is empowered to place such subordinate
body under administratorship pending notice and hearing.  The
International President shall immediately refer the matter to the

11/5/02).  Neither Mosby nor any leader of Local 1042 attended the hearing, which was held in Norwalk.  See Mosby Dep. at 86-87; Judicial Panel decision 12/4/02 at 3.  The hearing officer was John Seferian; evidence was presented by Larry Weinberg, General Counsel for the International Union.  Testimony was taken from auditor Owen Martin, Local 1042 member Randall Spinks, and Glynn. The Judicial Panel held that "[i]t is obvious that the local is in violation of the International Constitution by being delinquent in its per capita tax payment to Council 4.  Further, the minutes of a local meeting reflect that a motion was passed to decertify AFSCME.  The administratorship ... is affirmed." Judicial Panel decision at 3.

The minutes to which the panel referred reflect a meeting held in a school parking lot on November 2, 2002:

> The members voted for Alvin Mosby President of [L]ocal 1042 to file a petition for the union to decertify all of their ties with Council Four, AFSCME and the

---

Judicial Panel for hearing in the manner hereinafter provided, shall notify the subordinate body, and shall promptly submit a written report to all members of the International Executive Board notifying them of such action and the reasons therefor."
    Section 38 of the International Constitution provides: "Immediately upon the International President's taking any acton under Section 36 above, the Chairperson of the Judicial Panel shall appoint from among the members of the Panel an Administratorship Hearing Board...."  Further, pursuant to Section 39, a "hearing shall be held before the Administratorship Hearing Board as soon as is consistent with due process, but with not less than seven days' notice, and not later than twenty-one days after the imposition of any administratorship pursuant to Section 36 herein.  All interested parties shall be given a fair opportunity to present their views on the matter."

> International union at the way they treated the
> President, union officers and the Local 1042
> membership.  The membership voted to decertify all our
> ti[es] with AFSCME and the International and stand
> behind our President Alvin Mosby and other elected
> Union officers.  All In favor none oppose.  There were
> 37 members present. ...

Judicial Panel decision at Ex. 6.

Mosby testified that the minutes are a correct report of the events of the meeting.  Mosby Dep. at 55-56.  The meeting also was covered in an article in the Norwalk newspaper headlined "Union head urges end to affiliation."  Def. L.R. 56(a)1 Stmt. Ex. 16.

On December 19, 2002 and again on January 8, 2002, Mosby filed petitions with the Connecticut Department of Labor seeking to decertify Local 1042 from AFSCME.  Id. Ex. 23, 24.  There is no evidence whether the Labor Department acted on the petitions.

On May 6, 2003, three individual members of Local 1042, Etta Lewis Jones, William Bruce, and Agnes Giltinan, who are African American, Def. L.R. 56(a)1 Stmt. Ex. 22 (Aff. of Kevin Murphy) at ¶ 5, brought individual charges against the plaintiffs in this case.  The letter accused plaintiffs of financial mismanagement, failure to cooperate with Council Four, and advocating decertification from AFSCME.  Def. L.R. 56(a)1 Stmt. Ex. 25 (Judicial Panel Case No. 03-42).  A hearing was held on July 31, 2003, presided over by Gloria Plowell, id., who is an African American lay hearing officer for the AFSCME Judicial Panel and a

Registered Nurse.  Glynn Dep. at 41.  On approximately October 7, 2003, Plowell issued a written decision determining that there was insufficient evidence to support the charges of financial mismanagement and uncooperativeness, but "[c]learly, the accused intended to decertify and therefore, they are guilty of this charge."  Judicial Panel decision at 7.  As a result, plaintiffs in this case were expelled from AFSCME membership.

By the close of discovery in this case, Local 1042 remained under Glynn's administratorship.  Glynn Dep. at 18; Murphy Aff. ¶ 4.  It was run by several committees selected at a meeting of the membership in December 2002.  Def. L.R. 56(a)1 Stmt. Ex. 26 (Local 1042 Newsletter).  Of the 18 members on these committees, four are African American and two are Hispanic.  Id.; Murphy Aff. ¶ 5.

The General Counsel of AFSCME International stated that "Local 1042 was not singled out in any way for 'special' or different treatment.  Local unions which fail to pay per capita taxes and/or which try to secede from AFSCME routinely are put into administratorship."  Def. L.R. 56(a)1 Stmt. Ex. 20 (Aff. of Larry Weinberg) at ¶ 5.  Glynn testified that Local 1725 of the Belchertown Police Department and Local 3117 of the Wakefield School Department also were placed in administratorship for nonpayment of per capita taxes.  Glynn Dep. at 17-18, 20.  No evidence in the record indicates the existence of any other

10

AFSCME local that failed to pay per capita taxes and that was not placed in administratorship by AFSCME International.

Finally, the evidence shows that AFSCME International, and specifically the International President and the Judicial Panel, make decisions regarding both administratorship and expulsion of members, and Council 4 plays no role.  Weinberg Aff. ¶ 3; Glynn Aff. ¶ 2; Glynn Dep. at 37, 55; Luciano Dep. at 8.  An individual may be expelled from AFSCME only if another member brings that individual up on charges before the Judicial Panel.  Luciano Dep. at 8.

## II.  STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact to be resolved at trial and that the moving party is entitled to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Materiality is determined by the substantive law that governs the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

586 (1986).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim.  Celotex, 477 U.S. at 322-23.  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'"  Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001), quoting Celotex, 477 U.S. at 324; see also Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").  The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor.  Anderson, 477 U.S. at 249 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").  In making this determination, the Court draws all reasonable inferences in the light most favorable to the party

opposing the motion.  <u>Matsushita</u>, 475 U.S. at 587.  However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient.  <u>Id.</u> at 586 (citations omitted).

## III. DISCUSSION

### A.   Count One: Employment Discrimination

Title VII of the Civil Rights Act of 1964 provides:

> It shall be an unlawful employment practice for a labor organization --
>> (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race ...
>> (2) to limit, segregate, or classify its membership or applicants or membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race...

42 U.S.C. § 2000e-2(c).

Defendants argue that this Court lacks jurisdiction over this Count One because Title VII was intended to remedy discrimination in employment, and plaintiffs were not employees of Local 1042 or AFSCME, nor was their employment affected by their dispute with AFSCME.  Def. Mem. of Law [doc. # 41] at 16. Title VII cases against labor organizations typically have alleged that the union's discrimination against the plaintiff

directly affected plaintiff's job conditions or opportunities.[3]
However, defendants' argument is oversimplified for two reasons.
First, Mosby did receive a stipend from Local 1042 and thus it is
debatable whether he was or was not a union employee.  Second, §
2000e-2(c) prohibits a union from "exclud[ing] or ... expel[ling]
from its membership, or otherwise ... discriminat[ing] against,
any individual because of his race."  The Court need not address
this issue, however, because, as discussed below, plaintiffs have
not come forward with evidence on which reasonable jurors could
infer that the union's decisions were motivated by plaintiffs'

---

[3] See, e.g., Goodman v. Lukens Steel Co., 482 U.S. 656 (1987)
(superseded by statute on other grounds) (holding that union
violated Title VII by failing to process grievances asserting
race discrimination by employer); Greenslade v. Chicago Sun-
Times, Inc., 112 F.3d 852, 866 (7th Cir. 1997) (Title VII claim
exists against union for breach of duty of fair representation if
plaintiff can show that union failed to bring grievance regarding
job transfer because of employee's sex); Marquart v. Lodge 837,
Int'l Assoc. of Machinists and Aerospace Workers, 26 F.3d 842,
853 (8th Cir. 1994) (plaintiff's claim that union failed to
process her sexual harassment grievance because the perpetrators
were favored male union members was sufficient to make out a
prima facie case against union under Title VII); Romero v. Union
Pac. R.R., 615 F.2d 1303, 1310 (10th Cir. 1980) (union liable for
retaliation under Title VII where it threatened not to pursue
plaintiff's reinstatement to job unless he dropped EEOC
complaint); Anderson v. Gen. Dynamics Convair Aerospace Div., 589
F.2d 397, 401 (9th Cir. 1978) (where union membership was
required under collective bargaining agreement and plaintiff was
discharged for failure to pay union dues, plaintiff stated Title
VII claim against union and employer for failure to accommodate
her religious beliefs, which prohibited union membership);
Alexander v. Local 496, Laborers Int'l Union of N. Am., 778 F.
Supp. 1401, 1418 (N.D. Ohio 1991) (where union exercised
"substantial control over construction job opportunities" through
its referral program, it could be held liable for the racially
discriminatory effects of union membership policies).

race.

The familiar <u>McDonnell Douglas</u>/<u>Burdine</u> test applies a three-prong burden-shifting framework in Title VII cases.  Under that framework, plaintiffs first must establish a <u>prima facie</u> case of discrimination on account of race.  <u>See</u> <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 (2d Cir. 2000).  To do so, they must prove: (1) membership in a protected class; (2) qualification for the position; (3) adverse action; and (4) circumstances giving rise to an inference of discrimination on the basis of membership in the protected class.  <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973), <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000). "A plaintiff's burden of establishing a prima facie case is de minimis."  <u>Abdu-Brisson v. Delta Airlines, Inc.</u>, 239 F.3d 456, 467 (2d Cir. 2001). Defendants do not dispute that plaintiffs can prove the first two prongs: they are African American and were qualified to hold positions as Local union leaders.  It is also undisputed that plaintiffs were stripped of positions as elected leaders of Local 1042 and expelled from AFSCME membership, and their Local placed in administratorship.[4]

---

[4]<u>Cf.</u> <u>Kasper v. City of Middletown</u>, 352 F. Supp. 2d 216, 232 (D. Conn. 2005) (Droney, J.).  In <u>Kasper</u>, the female plaintiffs alleged their union local "conspired with" the municipality "to prevent them from being elected as union officers, and that after the discriminatory election, [the local] appointed an all-male negotiating committee, whose members refused to address the concerns of white-collar employees," who were predominantly female.  <u>Id.</u>  The Court held that plaintiffs could not make out a prima facie case because they had not "suffered an adverse

In this case, defendants assert that plaintiffs cannot meet the fourth prong of the prima facie case because Local 1042 was placed in administratorship for failure to pay per capita dues and attempting to decertify the union, and plaintiffs were expelled from AFSCME also for attempting to decertify, and no inference of race discrimination can be drawn from these events. The evidence shows that Local 1042 did not, in fact, pay dues to Council Four or AFSCME International for approximately 10 months from December 2001 to September 2002, and there was an arrearage of over $16,000 at the time Glynn was appointed administrator of the Local in October 2002.  Mosby states in his affidavit that he reached an agreement with Murphy for partial payment of dues beginning in September 2002.  It is undisputed that defendants rejected the first partial payment check tendered that month.

Accepting Mosby's assertion that Murphy had agreed to partial payment, the fact that Council Four later rejected that payment raises no inference of race discrimination.  Plaintiffs do not assert that any similarly-situated union with white membership or leadership was treated differently.  Plaintiffs have not pointed to any other local that was in arrears and

---

employment action due to the implementation of the contract, nor have they made a prima facie case that any practice contained in the collective bargaining agreement caused a disparate impact upon women in the union." Id. (emphasis supplied). No authority was cited for the proposition that plaintiffs were required to show an adverse employment action as opposed to an adverse action affecting their union membership.

16

either promised or allowed to make partial payments.

By October 2002 Local 1042 already was 10 months in arrears, and under the International Constitution, Art. IV, Sec. 3, "[f]ailure of a local union to remit its Council per capita tax for any month within sixty (60) days after such local is declared delinquent shall result in the automatic suspension of the local...." <u>See</u> Def. L.R. 56(a)1 Stmt. Ex. 5.  Therefore the Local could have been suspended within 60 days of nonpayment, and nothing in the International Constitution authorized Council Four to negotiate a partial payment plan.  The partial payment dispute is immaterial to the race discrimination claim at issue.  Because it is undisputed that Local 1042 did not pay its dues in a timely fashion, and that nonpayment is grounds for suspension under the International Constitution, and plaintiffs have not proffered evidence of any other similarly-situated white union that was treated differently, no inference of race discrimination can be drawn from the fact that Local 1042 was suspended and placed in administratorship for nonpayment of dues.

The Local was placed in administratorship for the additional reason that it attempted to decertify, and the minutes from a Local 1042 meeting on November 2, 2002, show a vote of the members present to petition for decertification, and thereafter in December 2002 and January 2003, Mosby filed two decertification petitions with the Connecticut Department of

17

Labor.

Plaintiffs assert that similarly situated white union officers and Locals were treated differently.  In particular, Mosby testified that he met with the Causcasian president and vice president of a Local in Stamford that had decertified from AFSCME and suffered no consequences.[5]  However, there is undisputed evidence in the record that the Stamford Local did not refuse to pay per capita dues.  Weinberg Aff. ¶ 6.  Further, it is undisputed that union members only may be disciplined or expelled upon the complaint of another member, Luciano Dep. at 8, and there is no evidence that any member of the Stamford local brought any charges against its leadership over decertification. In the absence of such charges, and in the absence of evidence that the Stamford Local owed back dues, it cannot be said to be similarly situated to Local 1042.

Plaintiff also argues that AFSCME Local 1565 in Connecticut, representing corrections officers, was treated differently from Local 1042 because it was not placed in administratorship after

_____

[5]Defendants argue in their Reply, [doc. # 55] at 1, that all of plaintiffs' evidence concerning Local 1083 is "inadmissible hearsay."  However, plaintiff testified in his deposition that he had met the president and vice president of the Stamford Local and therefore he knows from personal observation that they are white.  Additionally, ¶ 6 of the affidavit of Larry Weinberg, General Counsel for AFSCME International, suggests that the Stamford Local was not placed in administratorship.  These facts are established on the basis of the witnesses' personal knowledge.

the president embezzled funds.  <u>See</u> Pl. L.R. 56(a)2 Stmt. Exs.
38, 39.  However, there is no evidence of the race of the
president or leadership of that union.  Plaintiffs' evidence
shows that the president returned the funds and resigned from
office; it does not indicate that Local 1565 was in arrears on
its dues.  Thus the situation of Local 1565 is distinguishable on
many levels from that of Local 1042 and cannot serve as a
comparison.

Additionally, Glynn testified that two other locals in New
England that stopped paying per capita dues were placed into
administratorship, and there is no evidence in the record that
any Local that stopped paying dues escaped administratorship.

It is undisputed that administratorship decisions are made
by the International President and by the Judicial Panel, here
John Seferian.  Plaintiffs did not attend the hearing on November
7, 2002, and there is no evidence that Seferian ever had met
plaintiffs.  While the auditor and a member of Local 1042, both
of whom had met plaintiffs, testified at the administratorship
hearing, the record of that hearing is devoid of any testimony or
evidence discussing or hinting at the race of the Local's
leadership.  Glynn, the administrator, stated that she never had
met plaintiffs and did not know their race until after she was
appointed to run Local 1042.  Glynn Aff. ¶ 1.

Plaintiff argues that an inference of discrimination in the

administratorship proceedings can be drawn from the current
committee membership of Local 1042.  Because the Local still is
in administratorship, no new elections have been held so there is
no official leadership.  The committees now assisting Glynn in
running the Local include 18 people, of whom four are African
American and two are Hispanic.  The record does not contain
complete evidence concerning the composition of the Executive
Board prior to the administratorship, but Council Four's Kevin
Murphy states that it had "approximately three white members...."
Murphy Aff. ¶ 3.  This indicates that the leadership was racially
mixed before the administratorship as well as after.  Even if one
could infer that a higher percentage of the leadership prior to
the administratorship was African American, there is no evidence
from which it could be inferred that the composition of the
current committees resulted from racial animus because there is
no evidence in the record concerning how the committees were
selected.

For these reasons, plaintiffs have not met their burden
under the fourth prong of the prima facie case because they have
not raised an inference that AFSCME International's decision to
place Local 1042 in administratorship was motivated by race.

Plaintiffs argue that the subsequent decision to expel them
from AFSCME was motivated by race.  They have presented, however,
no evidence of similarly-situated white members who advocated

secession from the union and were grieved by other members, but
not expelled.  There is, for example, no evidence that any member
of the Stamford Local ever attempted to bring the leadership of
that union up on charges of violating the AFSCME International
Constitution.  Nor is there any evidence that anyone from AFSCME
International or Council Four instigated or encouraged the three
members of Local 1042 who grieved Mosby and the other plaintiffs
here.  Thus no reasonable juror could infer from the record that
plaintiffs' expulsion from AFSCME was motivated by race.

Accordingly, defendants are entitled to summary judgment on
Count One of the complaint.

### B.   Count Two: Civil Rights Conspiracy

Under 42 U.S.C. § 1985(3):

> If two or more persons ... conspire ... for the purpose
> of depriving, either directly or indirectly, any person
> or class of persons of the equal protection of the
> laws, or of equal privileges and immunities under the
> laws; ... in any case of conspiracy set forth in this
> section, if one or more persons engaged therein do, or
> cause to be done, any act in furtherance of the object
> of such conspiracy, whereby another is injured in his
> person or property, or deprived of having and
> exercising any right or privilege of a citizen of the
> United States, the party so injured or deprived may
> have an action for the recovery of damages occasioned
> by such injury or deprivation, against any one or more
> of the conspirators.

Plaintiffs' theory under § 1985(3) is murky because Count
Two of their Second Amended merely incorporates all the factual
allegations in Count One (Title VII), and their brief in
opposition to the defendants' motion for summary judgment merely

21

recites the language of the statute without any further
discussion or analysis.  See Mem. in Opp. [doc. # 53] at 18-19.
It is assumed that plaintiffs assert a conspiracy between
individual defendants Luciano and Glynn to deprive plaintiffs of
their union membership and the benefits of their positions in
Local 1042, such as the stipends they received for serving as
officers.

"The elements of a claim under § 1985(3) are: (1) a
conspiracy; (2) for the purpose of depriving, either directly or
indirectly, any person or class of persons of equal protection of
the laws; (3) an act in furtherance of the conspiracy; (4)
whereby a person is deprived of any right of a citizen of the
United States."  Brown v. City of Oneonta, 221 F.3d 329, 341 (2d
Cir. 2000) (internal citations, alterations and quotation marks
omitted).  Thus Section 1985 prohibits conspiracies born of
"invidiously discriminatory motivation," Griffin v. Breckenridge,
403 U.S. 88, 101-02 (1971), and "'aimed at interfering with
rights' that are 'protected against private, as well as official,
encroachment.'" Bray v. Alexandria Women's Health Clinic, 506
U.S. 263, (1993) (plurality op.) (quoting Carpenters v. Scott,
463 U.S. 825, 833 (1983)).  Further, "[i]n order to maintain an
action under Section 1985, a plaintiff must provide some factual
basis supporting a meeting of the minds, such that defendants
entered into an agreement, express or tacit, to achieve the

unlawful end." <u>Webb v. Goord</u>, 340 F.3d 105, 110 (2d Cir. 2003) (internal citations and quotation marks omitted).

In this case there is no factual support for the existence of either a conspiracy or invidious racial discrimination. As discussed above, no reasonable juror could conclude that the actions of AFSCME International in placing Local 1042 under administratorship or expelling the plaintiffs from membership were motivated by race. Furthermore, there is no evidence indicating that individual defendants Glynn or Luciano harbored racial animus toward plaintiffs. Glynn had never met plaintiffs until after the union was placed under her administratorship, and she played no part in the expulsion proceedings. Luciano interacted with plaintiffs concerning their representation by Council Four attorneys and the per capita arrearage, among other items, but there is no evidence from which it could be inferred that he harbored racial bias against plaintiffs. Nor did Luciano play any part, other than notifying plaintiffs and other Local 1042 members of their arrearage,[6] in having the union placed in administratorship. He was similarly uninvolved in the expulsion proceedings.

There is no evidence of any conspiracy between Luciano and

---

[6]It is unclear whether Luciano notified the International of the arrearage. Even if so, there is no evidence of disparate treatment because there is nothing suggesting that Luciano refused to refer for suspension any white-led unions in arrears.

Glynn.  The record does not suggest that Luciano ever even communicated with Glynn about Local 1042 before the International President appointed her as administrator.

For these reasons, plaintiffs' Section 1985(3) claim must fail as a matter of law, and defendants are entitled to summary judgment on Count Two of the complaint.[7]

## IV.  CONCLUSION

Accordingly, defendants' Motion for Summary Judgment [doc. # 40] is GRANTED and this case will be closed.

IT IS SO ORDERED.

/s/_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 24th day of March, 2006.**

---

[7]Plaintiffs' Opposition to Defendants' Motion for Summary Judgment [doc. # 53] also briefs a claim under 42 U.S.C. § 1981, but the Second Amended Complaint contains no such claim.  Only a claim under § 1985 has been alleged in the operative complaint. See Second Am. Compl. [doc. # 38].